# Commonwealth ex rel. *against* The Mayor of Lancaster.

The performance of a corporate function is not a duty to be demanded by action, but may be compelled by *mandamus*.

The supreme court will not award a *mandamus* to the mayor of the city of Lancaster, to issue a certificate of loan to a member of the councils for special services rendered by him in the business of the corporation, although a resolution directing him so to do had been passed by the select and common council.

THE Commonwealth ex relatione William Whiteside against John Mathiot, mayor of the city of Lancaster.    This was an application to this court for a rule upon the respondent, to show cause why a *mandamus* should not issue to them to comply with the direction of the following resolution, passed by the select and common council of the city.

*Resolved*, That the mayor be, and he is hereby authorised to issue upon the credit of the city, certificates of loan to Thomas Jefferies, chairman, and William Whiteside, secretary of the railroad committee, for the sums of 200 dollars each, and like certificates of loan for the sums of 100 dollars each, to the six remaining members of said committee, redeemable in one year, without interest, and being in full for services rendered by said committee.

The rule was founded upon the following affidavit:

Lancaster county, ss.—Before me, an associate judge of the court of common pleas of said county, personally appeared Ingham Wood of the city of Lancaster, who being duly affirmed according to law, deposeth and saith, that by a joint resolution of the legislature of the 24th of April 1832, the corporation of the city of Lancaster were allowed to change the location of the Philadelphia and Columbia Railroad, between the little and big Conestogo bridges, so that the same should pass through the city of Lancaster, at or near the inter-

[Commonwealth ex rel. v. The Mayor of Lancaster.]

section of North Queen and Chestnut streets, under certain provisoes and conditions, which were complied with, and the alteration has been completed.

On the 1st of May 1832, the select and common councils of the said city, by a joint resolution, appointed a committee, consisting of three members of each council, whose special duty it should be, forthwith to procure Joshua Scott to survey and locate such route for the proposed alteration of the Columbia and Philadelphia Railroad, as to the committee and Mr Scott may be deemed most beneficial to the city.   The deponent was appointed one of this committee on behalf of the common council.   On the 7th of May 1832, one member from each council was added to this committee, which was called the railroad committee; and by the same resolution, the committee were directed to report as speedily as practicable to the councils, the proposed route of the aforesaid alteration as surveyed and located by Mr Scott, together with an estimate of the probable expense of said route, and also the damages which the city might in consequence of its faith already pledged, be called on to pay.   Deponent attended assiduously, and with considerable sacrifice of his own interest, to the duties imposed upon him as member of the said committee in assisting in the survey, location and construction of the said alteration in the railroad, and settling claims of damages occasioned thereby.   In the performance of his duties as member of the committee, besides attending many deliberative meetings of the committee, he spent about one hundred days on the road, during many of which he was employed from morning till night in fatiguing manual labour.   The expense of superintending the construction of the alteration of the railroad, the labour of which fell upon deponent, and the other members of the committee, was estimated by Moncure Robinson, Esq., an engineer employed by the state to estimate the cost of the forementioned alteration, at 6848 dollars 9 cents.   On the 3d of February 1835, the select and common councils of said city, by a resolution adopted in select and common council, authorised the mayor of the said city to issue upon the credit of the city, a certificate of loan for the sum of 100 dollars to deponent, redeemable in one year without interest, and being in full for services rendered by him as member of the railroad committee. This certificate of loan deponent has never received, and John Mathiot, Esq., mayor of the said city, refuses to comply with the said resolution, and to issue the same.

INGHAM WOOD.

Affirmed and subscribed, May 6th, 1836, before me,

SAMUEL DALE.

To which the following answer was made by the mayor.

John Mathiot, mayor as aforesaid, in answer, &c. states as follows: that the railroad committee of the select and common councils of said city, consisted of Messrs Thomas Jefferies, Godfried Zahm, Jacob Dorwart and William Whiteside of the select council, and

V.—U

[Commonwealth ex rel. v. The Mayor of Lancaster.]

Messrs Ingham Wood, Jacob Snyder, Timothy Rogers and Martin Shreiner of the common council, six of whom were appointed on the 1st and two on the 7th of May 1832, and continued as said committee until the 8th of February 1833, when a joint standing railroad committee was appointed in the place of the aforesaid committee, to continue until the next annual city election, the old members being all re-appointed on said committee, except Mr Dorwart, whose official term as a member of the select council had expired, and Henry Longenecker appointed in his stead. That the members of said committee, on part of the common council, had been re-elected common councilmen just prior to their re-appointment as members of said committee. That on the 7th of February 1834, a standing railroad committee was appointed to continue until the Friday after the annual city election in 1835, if so long necessary, and the members of the last year's committee appointed on this, and the members on part of common council, re-elected councilmen a short time prior to their re-appointment on said committee. That on the 6th of May 1834, Ingham Wood, one of said committee, resigned his seat as a member of the common council, and Mr Charles Gillespie was appointed on said committee to fill the vacancy occasioned by said resignation.

That on the 3d of February 1835, when the resolution was passed directing the mayor to issue certificates of loan to each of the members of said committee, and in full of all services rendered by them, the committee then consisted of Messrs Jefferies, Zahm, Whiteside, Longenecker, Snyder, Rogers, Shreiner and Gillespie. Ingham Wood was not at that time a member of said committee.

This respondent would further state, that the members of council serve without compensation; and the members of said committee have been elected councilmen under this regulation, and a number of them re-elected, and also appointed and re-appointed members of said committee under the same.

That the circumstances of said resolution having been acted upon and passed the evening of the election for new councils, and after the closing of the poll, presented the matter in such a doubtful and unprecedented character, that the undersigned conceived it to be his duty to withhold his action thereon, until legally tested by a judicial tribunal of his country.

City of Lancaster, ss.—John Mathiot being duly sworn according to law, doth depose and say, that the facts, as set forth in said answer, are true to the best of his knowledge and belief.

                                        JOHN MATHIOT.
Sworn and subscribed this 10th of June 1836.
                                    *Coram*, HENRY KEFFER.


*J. K. Findlay*, for relator, contended that the right was indisputable, and there was no remedy to enforce it but by *mandamus*, which is the proper test of its propriety, and cited 4 *Bacon's Ab.*

[Commonwealth ex rel. v. The Mayor of Lancaster.]

496, 518 ; *Cowp.* 378; Green *v.* The African Methodist Episcopal Church, 2 *Serg. & Rawle* 255 ; Duffy *v.* The Harrisburg and Carlisle.Turnpike Company, 9 *Serg. & Rawle* 59.

*Frazier,* contra. The twenty-fifth section of the act of incorporation restrains the councils from granting money in compensation of services rendered by members. Debt would lie on the resolution, and if it would, the court will not, award a *mandamus.* 3 *Tuc. Blac.* 109 ; Commonwealth *v.* The County Commissioners, 2 *Penns. Rep.* 518; Commonwealth *v.* Rosseter, 2 *Binn.* 360.

The opinion of the Court was delivered by

GIBSON, C. J.—An action to establish the right could not be maintained against the corporation, because performance of a corporate function is not a duty to be demanded by action; and unless recourse might be had to the functionary in the first instance, the relator might have a case for redress without a remedy. This leads us directly to the resolution.

The eleventh joint rule to regulate the business of the councils, by which the validity of the particular act is drawn into question, might possibly have been framed with more precision. It bears that " all matters within the sphere of the authority of councils, which shall affect the citizens at large, and with which they ought necessarily to be acquainted, must be enacted by ordinance ; but matters merely respecting the duties of the city officers, or other objects of a particular nature, may be authorised by resolution." Granting that this resolution affects the citizens at large; that it is a matter with which they ought to be acquainted; and that it does not respect the duties of the city officers, or any object of a particular nature, though the last might possibly be made a subject of dispute, is it void for a departure from the prescribed form of enactment ? Had the form been prescribed in the act of incorporation, the affirmative might have been assumed without risk of contradiction; but a power to repeal is an incident of the power to enact. *Eodem modo quo oritur, eodum modo dissolvitur;* and hence we see that a body competent to make a by-law, is also competent to repeal it. *Wilcock, part* 1, *tit.* 237. And this holds though there be a clause expressly in derogation of the right to repeal. *Non impedit clausula derogatoria, quo minus ab eadem potestate res dissolvitur, a quibus constituuntur;* according to which, all attempts to restrain the repealing power by anticipation, are vain. It would, therefore, be immaterial had the rule been declared irrevocable by less than two-thirds. There is, however, no such declaration. It is urged that whether a majority had power to repeal it or not, it had in fact not been repealed; and that while it remained a rule, it was as obligatory as if it were irrevocable. There was, indeed, no formal repeal of it; but was it not dispensed with by making the resolution an act in derogation of it ? It was virtually repealed for the occasion when its

authority was disregarded by those who had power to control it; and the act of breaking through it, if not an abrogation, was at least a suspension of it.   If the preceding councils had not ability to bind their successors indissolubly, neither had they ability to put shackles on them that might be cast off but in a particular way.   Lord Bacon ridicules the notion of the civilians, that a derogatory clause is good to disable a subsequent act, unless it be itself repealed.   (*Maxims, Regula XIX*).   Adopted by a corporation, these rules of legislation resemble rules of conduct prescribed by an individual for his own government.   They are rules of internal action, with which those who are to deal with its external results, have no concern.   None but members of the body have to do with the structure of its machinery, whether its operations relate to reference, commitment, adjournment, or the like; or, where that matter is not regulated by the charter, to the form of expressing the corporate will.

But the twenty-first section of the act of incorporation, declares "that no alderman of the said city, nor any person holding an office of trust or profit under the laws of the commonwealth, or the ordinances of the select and common councils, the emolument whereof is paid out of the treasury of the said city, shall be competent to serve as a member of the select or common council."   The object of this was evidently to protect the treasury from the cupidity of its guardians, by putting them beyond the reach of temptation.   Its letter may not extend to the prohibition of salary for their services or jobs for their emolument, but its spirit certainly does.   Services in the councils of our civic corporations, have ever been gratuitous; and this was known to the legislature at the date of this act of incorporation, which, as well as the act for the incorporation of Pittsburg, is nearly a transcript from the act to incorporate Philadelphia, where compensation has not been dreamt of.   By the section under consideration, it is not expressly prohibited; but as power to provide it for the mayor is expressly given, and as it is expressly provided for the recorder, jurors and clerk, in the charter itself, we must intend it was meant to be withheld from the members of councils according to the maxim, *expressio unius est exclusio alterius,* especially as the purpose of the legislature seems to have been to put an impassable line of separation betwixt the capacity to give and the capacity to receive.   Now the compensation sought was earned by the relators, if at all, in the character of common councilmen; for in no other could they have been members of the committee.   But take it they acted as individuals employed in a particular service, and the result must be no better for them; for by no device can the character of a councilman and that of a paid servant of the councils be legitimately united in the same person; and though we cannot prevent it in the first instance, we can prevent the accomplishment of its purpose by withholding our assistance from it.   We think the present not an occasion to exert the extraordinary powers of the court.

Rules discharged.